**DEAN, Collector of Internal Revenue, v. CALDWELL & CO.**

No. 434.

District Court, M. D. Tennessee.

March 19, 1934.

H. R. Miller, Sp. Asst. to Atty. Gen., and A. O. Denning, Asst. Dist. Atty., of Nashville, Tenn., for plaintiff.

Roberts & Roberts, of Nashville, Tenn., for defendant.

GORE, District Judge:

The collector of internal revenue is seeking, in this proceeding, to collect "Documentary Stamp Taxes" under title 8 of the Revenue Act of 1926 (26 USCA §§ 901, 902, and notes, 903 et seq.), and title 2, part 5, of the Revenue Act of 1928 (26 USCA §§ 901 and note, 902, 907a), assessed against the receivers of defendant, but covering transactions prior to receivership.

The assessment involves four classes of transactions: (1) Stock held by nominees for the use of defendants; (2) stock pledged to Bank of Tennessee by defendant as security for moneys borrowed; (3) where warrants were attached to bonds, giving the holders of the warrants the right to purchase stock in the corporation; and (4) assessments concerning stocks known as the "Phyllosam Corporation."

The assessment covers the years 1928, 1929, 1930, and 1931.

Defendant was a very large investment corporation, with its main office in Nashville, but it had twenty-seven branch offices throughout the United States, extending from New York to New Orleans, and as far west as California; in addition, it owned many subsidiaries. It handled approximately $100,000,000 of securities annually, and employed many agents, employees, etc.

One of its subsidiaries was the Bank of Tennessee, which was organized as a banking corporation, but it never engaged in general banking business. It was located in the building owned and occupied by the defendant, in Nashville, and paid no rent; its entire capital stock was owned by defendant. The officers and directors of defendant and the Bank of Tennessee (with but one exception) were the same. The bank owned no property, not even a vault, or other fixtures. It was created and existed for the benefit of Caldwell & Co., in prosecuting its extensive business, and its organization was essential to the successful operation of Caldwell & Co.

The Bank of Tennessee went into the hands of receivers on November 5, 1930, and Caldwell & Co. went into receiver's hands on November 13, 1930.

All the transactions embraced under the first classification and designated in the proof as "nominee cases" were securities bought by Caldwell & Co., but taken in the name of, transferred to, and held by a nominee.

During the time covered by the assessments, Mr. E. A. Goodloe was cashier of the Bank of Tennessee. Prior to that time, he was an employee of Caldwell & Co.

Practically the entire business of the branch offices was in making sales of stocks and bonds, and all stocks and bonds sold at these branch offices were delivered from the Nashville office, and all inventories and bookkeeping were done in Nashville.

The success of defendant's business was dependent upon immediate delivery of the stocks and bonds sold. The various officers of Caldwell & Co. (who were also its directors) were assigned various specific duties, some (and at times all) of them were out of the city a considerable portion of the time, so it was impossible to have a board of directors present every day in order to make transfers of stocks and bonds sold. Hence it was imperative that some method be devised whereby some one would be authorized to assign these securities to the various purchasers. Caldwell & Co. (as did all such institutions) nominated one of its employees, in most instances, Mr. Goodloe, who was always present, as nominee, who could make proper indorsements and immediate deliveries. The appointment of a nominee was imperative, as time was the essence of the success of the business. At no time did the nominee own any beneficial interest in the securities held in his name, or exercise any act of ownership, or sell any of them. He received no profits from any transfers; his salary was paid by the Bank of Tennessee. Dividend checks were made payable to the nominee, but were by him indorsed and turned over to Caldwell & Co.

The second classification includes securities pledged by Caldwell & Co. to the Bank of Tennessee, for moneys borrowed from the bank, by Caldwell & Co. These transactions were designated as "inter-company" transactions. When Caldwell & Co. would borrow money from the Bank of Tennessee, it would pledge certain of its securities, which securities were placed in a safe kept by Caldwell & Co. for that purpose, but no change was made on the ledger sheets of Caldwell & Co. for the transfer. In each case Caldwell & Co. would make and sign a statement of the facts of the transaction and attach it to the securities pledged. No note was executed evidencing the loan. It was merely a bookkeeping transaction. Caldwell & Co. would credit the bank with the amount of money borrowed, and Caldwell & Co. would also be charged by the bank with the same amount. Caldwell & Co. would deposit an equal amount of securities, plus the ordinary banking margin, with the Bank of Tennessee, to secure the loan. A Mr. E. B. Smith was trust officer for both Caldwell & Co. and the Bank of Tennessee, and, as such, was in possession of these securities. Actual transfer of possession from one person to another was never made, but they were always in the possession of Mr. Smith, and the transaction was simply a book transaction. If Caldwell & Co. should sell some of the securities pledged to the Bank of Tennessee, prior to the payment of the indebtedness for which they were pledged, it would take them down and substitute other securities. Maybe there would be a number of substitutions of securities in this manner before the indebtedness was entirely wiped out. The transaction was never considered a sale.

The third classification covers cases where warrants were attached to bonds purchased by Caldwell & Co., such warrants giving the holder of the bonds the right to purchase stock in the corporations. Same may be divided into two separate heads: The first is illustrated by the Associated Motor Terminals Company, of St. Louis, Mo., on which an assessment of $4,880 (item 6) was made by the government to cover documentary stamps on the transfer, or upon the right to receive stock of said company, which stock was issued direct to Caldwell & Co.'s nominee of July 23, 1928. The stock was issued to a young man named Baxter Walker, an employee of the St. Louis office of Caldwell & Co., under the following circumstances: Caldwell & Co., along with other parties, entered into an agreement to purchase, or to underwrite and purchase, the securities issued by the Associated Motor Terminals, which was a consolidation of several garages in St. Louis, and these bonds comprised all the first mortgage bonds of said terminals company and also leasehold bonds. These leasehold bonds were issued in the form of convertible bonds, and gave the holder, at his option, until and including April 30, 1938, the privilege of changing these securities for preferred and common stock of said motor terminals company. The terminals company necessarily had to issue its stock and carry it on its books in order to comply with this agreement, and, in so doing, necessarily had to attach stamp tax to such stock when issued. It did not come to Caldwell & Co., and never was in its possession or under its control; but such stock simply remained and was held in the treasury against the outstanding bonds. While I have not

seen the books of said terminals company, yet I understand the rule to be that the stamp tax should have been paid on the original issue and documentary stamps were attached when the stock was issued. Caldwell & Co. never received the stock, it was never issued to Caldwell & Co. or in its name, and never came into its hands; it had to remain in the hands of the terminals company or the trustee under the bond issue.

The assessment of $1,966 (item 10) is based on documentary stamp tax on transfer of right to subscribe for 60,000 shares of no par common stock, also 38,300 shares repurchased and sold of the Alabama Mills Company on June 26, 1928 and subsequent dates. This assessment was based on stock purchase warrants attached to the bonds of Alabama Mills Company. A circular on these bonds shows that each bond will bear a stock purchase warrant entitling the holder thereof to purchase common stock of the company at $5 per share at any time during the first three years, at $10 per share during the next succeeding three years, at $15 per share during the next succeeding three years, and at $20 per share during the last six years. In other words, in the government's schedule it assesses Caldwell & Co. on these common stock purchase warrants, which constitute a part of the bonds themselves. The stamp tax was paid on the bonds themselves, and, of course, covered the entire instrument composed of the bond and the warrant attached to it. Then the stamp tax was paid on the stock as it was issued by the parent company to cover the outstanding warrant, and thus it was that the warrant itself did not constitute a taxable instrument.

The fourth classification covers an issue of stock known as the "Phyllosam Corporation Stock." This stock was never owned by Caldwell & Co., but was owned by Rogers Caldwell Company of New York. The stock was borrowed by Caldwell & Co. and was pledged to the Bank of Tennessee, as were the stocks and bonds embraced in classification 2, above, and what has been said with regard to class 2, supra, is applicable to this stock.

Conclusions of Law.

I think all the assessments are void.

■ It is conclusively shown that the nominee had no interest in the stock embraced in class No. 1, and merely took title to the same for the convenience of his employer, the defendant, in connection with future sales and transfers of stock to the public, and is nontaxable under article 29 of regulation 71, title 8, of the Revenue Act of 1926, and title 2, part 5, of the Revenue Act of 1928, when issued in the name of a nominee, the other provisions of the Act (Schedule A–2, Regulation 71) being complied with.

■ In class No. 2: The stocks were not actually sold, but were only pledged or collated as security for money borrowed. All these transactions were under authority found in article 35 (i) of regulation 71, supra, a–3. See Union Trust Co. v. Heiner (D. C.) 26 F.(2d) 391.

■ The stocks included in class No. 3 are not taxable, because these stocks and bonds never came into the hands of, or became the property of, Caldwell & Co.

■ The securities assessed under class No. 4 were borrowed by Caldwell & Co. from Rogers Caldwell Company, of New York, and, under article 35 of regulation 71 supra, are nontaxable.